Colcock, J.
In deciding this case, adoctrine, which has been agitated with great ability in the different courts of the United States, as well as those of England, is brought to our view; and it is a subject of great astonishment to observe the contrariety, as well as vibration of opinion which has existed on it. Before I proceed to give my opinion »n this case, I can but regret, that a case has been *388 decided in our court on the conelusiveness of the sentence of a foreign court of admiralty, for had I not been restrained by that decision, (Waiter and Payne vs. Bethune,) I should have been disposed to say at once, that they should haye no weight with us. That they should not be considered as conclusive in any respect whatever.
When I read the opinion of some of the most distinguished men who ever graced the English bench, in which they deplore the comity which has given such effect to these sentences, and particularly, that of Lord Ellenborough in two very late cases (Fisher and Ogle, and Donaldson and Thompson,) in which he says, e( the comity by which these sentences are received is overstrained,” and that he, like Lord Thurlow, shall die in the belief that they ought never to have been admitted; that they rest on the authority in Shower, (Hughes vs. Cornelius,) 2nd vol. 232. which does not fully support them, and that the practice of receiving them often leads in its consequence to the greatest injustice-Campbell, 419. 429. When add to this the conduct - of the two great belligerents, who have long since ceased to regard the laws and usages of nations, and from some cause or other have subjected almost every neutral vessel which navigates the ocean to condemnation. When I discover in the admiralty courts of France but an echo of the sovereign’s will, and advert to the open and avowed declaration of ?3ir Wm. Scott, who has said he would be governed jn his decisions by the Orders in Council, I cannot *389 but conceive that we are suffering the interests of our fellow citizens to be sacrificed, in permitting the decisions of such tribunals to weigh a feather. I should be reluctant to innovate upon any of the . established doctrines of the maritime law, but in a ease, in which it is obvious that the principles, upon which the doctrine was formerly established, cease to exist, I think we cannot correctly say that the doctrine itself exists, u cessante ratione cessat et ipsa lex.” Although it may have been proper to pay some respect to the decision of tribunals which were governed by the laws of nations, and a due regard to the rights of neutrals who might be found on the high seas, it certainly is not proper to respect the decisions of those who both by their language and acts declare that they are no longer governed by any known or permanent standard of justice. Independent of the existing state of things, I think so much favour should not be shewn to courts, in which the judges hold their seats at the will of those who appoint them, in which the parties interested are sworn, and in which, according to the opinion of Judge Cooper, the income of the judge depends in a great measure on the number condemnations.
While I regret that any countenance has been given to the sentences of these foreign tribunals, I rejoice to find that it has not been carried to the length contended for on the present occasion, and to which it has been carried, in some of the cases which are to be found in the English books.
*390 The question now before us is, u Has the warranty of neutrality in the policies been falsified ?” A condemnation as good and lawful prize is produced in evidence of this. We are gravely told, that the authorities produced, should regulate us in this respect. That it is the decided doctrine in England, that a condemnation as good and lawful prize is tantamount to a condemnation as enemy’s property. This cannot be the case; and the latest and best authorities, in my opinion, prove that it is not so.
I should not have thought it necessary to consider what was the English doctrine, at the present day, in this respect, had it not been that one of the counsel contended strenuously, that we were bound to decide according to the English law, on account of some such agreement in the policies. Supposing this to be the case, I shall merely refer to Marshall, p. 411. “ The sentence is only conclusive as to the points which it professes to decide.” And the two cases already referred to, decided by Lord Ellen-borough as late as 1808, — 1 Campbell, 418. 429. which decisions were not known, it appears to Mr. Justice Cooper when he delivered his very elaborate opinion in the case of Dempsee vs. Insurance Company of Philadelphia. But I shall never be induced by any authority, however respectable, to give my assent to what I conceive to be so grossly absurd. If there, were no other grounds of condemnation than that of enemy’s property, there might be some reason for the doctrine, but when w.e *391 know that vessels are daily condemned on other grounds, to say, that these courts shall be presumed to have decided on this alone, may suit the interest . . . of underwriting nations, and agree with their notions of right; but I humbly conceive that it is not in unison with our principles, nor with the principles of justice. When we consider that the admiralty courts are not deciding on the rights of the insured in that character, but that it is enough in them to decide that the vessel or cargo is good and lawful prize, (the contest being between the owners and captors,) is it not absurd in the extreme, to say the court has decided upon a certain ground, and upon that alone, which in fact may never have been before them? ,
As far as the doctrine has been decided in our courts the weight of authority is against the defendants. In Mayley vs. Shattuck, Cranch, 488. Mr. Justice Marshall says, “ these decisions have never been held to establish any particular facts, without which the sentence may have been rightly pronounced.”
I cannot avoid remarking that in most of the cases which have been discussed on this doctrine, there has appeared a strong disposition in the parties concerned, and, in some instances, in the judges to look into the grounds of decision in the admiralty courts. In the. first case, in which this doctrine was suggested by Lord Mansfield, (Bernard vs. Motteaux,) he had the proceedings of the court before *392 j1jm> And jn the case now before us, although the ^ ° defendants relied on this docirine, they by some means? g°t into the merits and grounds of the de-eision of the court of admiralty, for one of the counsel travelling wide of the conclusion of the sentence, says that proper papers were wanting as to the eleven negroes, and it was an attempt to mask enemy’s property. Upon the whole, I am of opinion, that the decision of the presiding judge was incorrect in this respect, and that, therefore, a new trial should be granted.
As to the case in which the verdict was given for the plaintiff, I am also of opinion that a new trial should be granted ; for if entitled to recover at all, he has certainly not recovered as much as was due to him. After abandonment the insured is to be considered as agent for the insurers without instructions. 5 Johnson, 324. And if he exercise a sound discretion, he is entitled to recover what expense he may have sustained on account of the underwriters. And here it appears that such a discretion was exercised; for the negroes brought more in New-Orleans, than could have been obtained for them in Nassau. The insured are therefore entitled to the freight of the Euphemia. I am of opinion^ that the motion should be granted.
Notí, J.
The importance of this case is not derived from the novelty of the question; nor its difficulty from want of all the light the subject is capable of. *393 For it has been so ably argued and fully considered both in Europe and America; that a person need only give an opinion on either side, and the reasons on which that opinion is founded will at once appear fa- ‘ miliar to every lawyer. But it is rendered important by the great interest the whole world,I may almost say,, has lately taken in it, and the effect the ultimate decisions of the courts in the United States may have on the mercantile interest, not only of America, hut all the nations of Europe, with whom we have commercial relations; and its difficulty occasioned by the conflicting opinions of the ablest judges and lawyers in England and the United States. A difficulty not a little enhanced by the doubt expressed by some able judges, of the correctness of decisions, to the binding efficacy of which they feel bound to submit.
The question whether the sentence of a foreign eourt of admiralty shall be conclusive in any case on a policy of insurance, is not now before us. This eourt has already decided, that it is so, wherever goods are condemned as <( Enemies’ property.” Which, I understand, to mean that it is conclusive as to every thing it professes to decide;
Not having been a member of the bench when that decision took place, I shall give no opinion upon it; but shall consider myself bound by it, until those of my brethren who then, or now, concur in it, shall feel disposed to review their opinions. That decision appears conformable to the settled doctrine in *394 England. But that it will be reconsidered both in England and the United States, I entertain no doubt. Whether it will be reversed or not, I will not pretend to determine.
But the modern innovations made by the belligerent nations of Europe on the laws of nations. Indeed, I may say, the total disregard they have shewn to all the natural and moral obligations by which nations have heretofore been governed will not only require a review of opinions bottomed on principles which no longer govern; but will authorise a departure from the most solemn decisions, founded on reasons which no longer exist. I can not believe that the English judges will suffer the shackles of former decisions long to chain them down to a blind and passive obedience to decrees, founded on evidence unsatisfactory to an honest mind. Judge Gross, 3d Bos. & Pull. 499. “ manifestly unjust.” Heath, Justice, do. “founded on Algerine, or worse “ than Algerine principles, and making the law a si stalking horse for piracy. Ld. Kenyon, 7D &.E. 696. “ proceeding on a system of plunder” Do. Pollard & Bell, 8 Zb & E. Neither will the American tribunals be more disposed to respect the sentences of courts, where the judges’ salaries depend in a great measure on the number of condemnations and their commissions; on the opinion of an executive whose will is law, and with whom power is right. Or of courts where executive decrees are considered in relation to the laws of nations, as the acts of Parliament are to the common law. Case of the Fox, 30th March, 1811, Sir W. Scott,
*395 But at present, that question is considered as put to rest. And the only question submitted to the court is, whether a condemnation as ee good and lawful prize,” is tantamount to a condemnation as (( enemy’s property.”
Before I proceed to a particular consideration of this question, I would observe that the English judges do not now submit to the conclusiveness of foreign sentences because the principle is correct, but because they feel bound by former adjudications. Lothian and Henderson, 3rd Bos. and Pull. 499. Fisher and Oggle, 1 Campbell. If therefore it can be shown that these decisions are founded on reasons, which do not authorise the conclusions drawn from them, it will at least prove that we are not bound to carry the doctrine further than it has already been carried.
The reasons given by the English judges why the sentence of a foreign court of admiralty ought to be conclusive in an action on a policy of insurance, are 1st, Because all the world are parties, and, therefore, all persons ought to be concluded by it. Lord Mansfield, Bernardi and Matheaux, Doug. 554. Park. 355. 2nd, Because their decisions are governed by the laws of nations, or the obligation of treaties. Lord Kenyon, Desoner vs. Ewer, Park. 360. Pollard and Bell, 8 D. and E. 437. 3rd, Because it is a comity due to nations. 5 East, 99.
With regard to the first, the conclusion perhaps *396 would follow if the premises were true. But it is A not a fact that all the world are parties. The underwriters never are a party to a suit between the captors and the insured. And the captors are nev-ei“ a party to the suit on the policy. To use the words of judge Cooper, (71) “ the nature of the actions is different; one is a question of prize, and u the other assumpsit founded on contract; the t{ parties are different; the law is different; the “ testimony is different; the judgment to he pro- “ nounced is different, and the effect of it is differ- “ enf.”
The second is, that courts of admiralty always proceed according to the laws of nations and treaties. But this again is not correct. The courts of every nation feel bound, and are always governed by their own municipal laws and decrees, although they contravene the laws of nations. In the case of Mayne and Walter, Parke, 362. the ship was warranted to be Portuguese, and taken by a French privateer, and condemned as good and lawful prize, because she had an English supercargo on board. But Lord Mansfield declared it to be an arbitrary apd oppressive regulation, contrary to the laws of nations; and that the party ought not to be concluded by it. A violation of the late Milan and Berlin decrees, or the British orders of Council, would afford to their courts as good a ground for the condemnation of a neutral vessel, as the violation of the laws of nations; and the obligation of treaties is as little regarded. The decisions of the English courts, that the muni *397 cipal regulations of any one nation are not obligatory on other nations, and that the sentences of courts, made in pursuance thereof are not conclusive in an action on a policy of insurance, at once contradicts the opinion that courts of admiralty always proceed according to the laws of nations. Indeed, Lord Kenyon, in the case above mentioned, (Pollard & Bell,} says of the French courts, that they proceed on a system of plunder. And I presume the English courts will no longer pretend that the laws of nations form the rules of decision in their courts of admiralty, since the declaration of Sir William, Scott, that the orders of the king and council are to the laws of nations what acts of 'parliament are to the common law.
But, 3rd, Finding that neither of the foregoing reasons would bear them out, it is said, that it is a comity due to nations to respect the decisions of their courts. I understand comity to mean respect, or what between individuals would be called civility or politeness. But it is to be observed that it is only the British courts, and those of the United States that are governed by this “ comity.” And if the charges made by the English Judges on. the French tribunals, “ that they proceed on a system ee of plunder “ on principles manifestly unjust “ on Algerine and worse than Algerine principles “ making the law a stalking horse for piracythat when they shall learn that the manner of wording their sentences does not render them conclusive, they will adopt such phraseology as will render *398 them so without regard to the real grounds of condemnation. 1 Campbell429. I say, if those ehar-ges are true, the French courts have certainly forfeited all claim to respect, and if we examine the American cases, we shall be led to conclude that the decisions of many of the English courts are entitled to but little more regard.
None of the reasons then on which the decisions of the British courts have been bottomed, will support their opinions. The time was when the laws of nations were respected, and when treaties were regarded as imposing some obligations on nations. The time, was when even in England and France were, or at least, affected to be, governed by the rules of common honesty, and their courts of admiralty influenced by a sense of moral morality, and when courts of admiralty actually did proceed according to the laws of nations, and the obligations of treaties, then indeed, such comity might be due to them. Then, each nation stood in relation to the other as different districts of the great republic of nations, governed by one great uniform system of laws. In that view, probably, it was, the subject was considered, when it was said, all the world were parties, (í sed témpora mutanturJ’
I have already shewn that even Sir William ¡Scott, the great oracle of maritime law, and of the law of nations, who, like Lord Coke, was thought to he not merely the expounder of the law, but the law itself j and who once professed to make the laws *399 of nations tifie rule of his decisions, finding that he must give up his place or his opinion, has had the weakness to surrender his principles and an immortal fame, to sordid interest. For while he reads . the laws of nations through the instructions of his government, it is the will of the executive, and not the law that governs.
Indeed, the English common law judges are so well satisfied that the reasons on which the decisions of their courts profess to be founded, will not bear them out, that they do not now pretend to make them the grounds of their present decisions. Their language is u stare decisis.” Lothian and Henderson 3 Bos. and Pull. 499. They acknowledge that they follow those decisions only because the law has been too loug settled, to be now shaken. Lord Ellenborough says it is by an overstrained comity that these sentences are received as conclusive evidence of the facts which they positively aver ; and that like Lord Tkurlow he shall die in the belief hat they ought never to have been admitted. 1 Campbell, 429. I, therefore, repeat again that finding these decisions no longer governed by principles which formerly prevailed, and that the reasons on which their former decisions were founded, no longer exist, they v/ill not only review those decisions, but will reverse them, if other good reasons cannot be found for their support.
But, without disturbing the decisions as far as they have gone, let us proceed to the question im *400 mediately before us, and enquire whether to eon-demn a vessel “ as good and lawful prize,” is tantamount to a condemnation as (i enemy’s property.”
This question may be considered in a two fold point of view. 1st, Whether it is implied by the terms of the decree that it is enemy’s property. 2nd, Whether it has been so decided by any courts whose decisions we ought to respect, and by which we ought to be governed^
With regard to the first, if there are other causes of condemnation, than that the property belongs to an enemy, which would make it good and lawlful prize, then condemning it for such cause does not necessarily imply that it is enemy’s property. Yet it would be condemned as “ good and lawful prize.” If the decree always set forth the grounds and reasons of the condemnation, the difficulty would be temoved. But we shall find that no reasons will ever be given, if it should be held, that a condemnation as good and lawful prize, without any reasons, should lead to an inference that it was enemy’s property, and, therefore, the decree conclusive.
It has already been shewn that a violation of any municipal decree or law, however oppressive and unjust it may be, is as good a cause of condemnation as that the property actually belongs to an enemy. Of this the case of Mayne and Walter is in point. So we have seen that the violation of the late French decrees, or British orders of council, is con *401 sidered in their courts as good a cause for condelu-nation as the violation of any treaty or law of nations. And the decree of course declares the property to he good and lawful prize. Nothing, therefore, is more obvious than that a condemnation as u good and lawful prize,” does not necessarily imply that it is enemy’s property.
We niay then admit a decree, condemning goods as enemy’s property, to be conclusive, and yet admit an investigation of the grounds of condemnation as i( good and lawful prize,” without any inconsistency. And it appears to me absurd to say, that a decree shall not be conclusive, where reasons are given which do not authorise it, and yet admit it to be so, where the grounds of condemnation are the same, merely, because the grounds are not stated in the decree. I am of opinion, therefore, that a decree of condemnation as i( good and lawful prize,” without giving any reasons to justify that decree ought not to be conclusive, unless the law. has been so settled by decisions which we are bound to respect, and by which wé ought to be governed. There does not appear to have been any decision of this court on the point. In the opinion given in the case of Walton & Dagan vs. Bethune, it is said, such a decree is not conclusive. But that perhaps ought to be considered as the opinion of an individual judge, and not the opinion of the court, because the point was not then, before the court. But it is sufficient for my purpose to say, it decides nothing as regards the principal case, and, as far as it is to be regarded, accords *402 witlt my opinionon that point. In the case of Salona vs. Woodmas, Parke, 362. Lord Mansfield held a sentence of condemnation, as “good, and lawful prize,” conclusive, although no special ground was stated. But in the case of Calvert and Bouville, 7th D. & E. 523, Judge Laurence says, that “ if it is ambiguous, or it does not appear on the face of the sentence, on what ground they proceeded, then we may receive evidence to shew what were the grounds of the decision abroad.” And in the case of Fisher' and Oggle, 1 Campbell, 418. the sentence was held not to be conclusive. That was an action, on a policy of insurance on the Juno, represented as an American ship, which had been condemned in a French court of vice-admiralty in Martinique. The sentence of condemnation was in these words, “ that it resulted evidently from the papers on board, that the expedition of the said ship Juno, her cargo, and the ope. rations of her captain on the coast of Africa, were for account of the brothers Geddes, merchants of London, who had, to mask the English property of this outfit, borrowed the American flag and passport of the said ship Juno, and taken for their agent and partner in this expedition captain Fisher, furnished with a certificate of citizen of the United States. It then goes on to condemn ship and cargo as “ good and lawful prize,” without stating any specific grounds for the condemnation. Lord Ellenborough said, “ we shew sufficient respect for French sentences, if we attach credit in our courts to what they distinctly say. It is often painful to go. this length, considering the piratical way in which they *403 proceed. But this sentence does not say that the ship was not American, and it is not to be considered as evidence of what it does not specifically affirm. A verdict was found for the plaintiff: and * 7 on a motion for a new trial he says, “ It is by an overstrained comity that these sentences are received as conclusive evidence of the facts which they positively aver, and on which they specifically profess to be founded.” The other judges were of the same opinion, and a new trial was refused.
The English decisions then on the point appear to be both ways; but the most modern are against the conclusiveness of foreign sentences, where, the property is condemned merely as, “ good and lawful prize,” and where there is no specific ground of condemnation stated. And such is the modern, belligerent code as affords no ground to extend the comity of nations. Treaties and the law of nations afford no security. It is truly said “that in the iniquitous conflict between British orders and French decrees, scarcely a vessel navigates the ocean, that is not subject to the denomination of “good and lawful prize” upon the text of the new belligerent code. Scarcely one escapes the rapacious grasp of the British or French cruisers, which like so many robbers infest the high road of notions. And an insatiable court of admiralty stands forever open to seize upon its prey, “ sedvestigia nulla retrorsum.” And if one fortunately escape condemnation, “ hssret lateri lethalis arando” The delay, the expense, the vexation attending trial, are often worse than condemnation.
*404 From this view of the subject, I have come to the J 7 conclusion, that the decree of a foreign court of admiralty condemning a vessel or cargo, as good and Prize? without assigning the grounds and reasons of that decision, ought not to be conclusive in an action on a policy of insurance. And, therefore, a new trial ought to be granted in this case.
Smith, J.
The first policy on the sehoolier Lucy, and the second policy on the fifty negroes, a part of her cargo, are both so intimately connected with the third policy, on the eleven negroes, and their fate so interwoven therewith, that, believing as I do, the sentence of condemnation of the court of vice-admiralty, at Nassau, is conclusive to falsify the warranty of neutrality of that part of the cargo, I shall without further investigation, upon that groud alone, object to a new trial on the first and second policies. It will necessarily result, therefore, that we bestow some more attention on the third verdict given on the third policy.
The defendants counsel in this case contended that they were not liable on the policy, because it was vacated by the sentence of condemnation in the vice-admiralty court, which completely falsified the warranty of neutrality.
¡On the part of the plaintiff it was contended, that the sentence of condemnation was not conclusive, and that he ought to be admitted to go into proof, in the *405 Court of Common Pleas, to shew the neutrality of the property. In support of this position, the authority of Fisher and Ogle, 1 Campbell, 418, was relied on, where Lord Ellenborough says, il he must 1 ‡ look to the adjudicative part of the sentence, and there he finds nothing distinctly stated as to the ship or her cargo not being American,” &c. From this opinion it is argued, that the judges in the English courts, where it is said this doctrine of the conclusiveness of a foreign sentence originated, have themselves abandoned it j and that they now allow these sentences to be opened in actions between the insured and insurer, in order to examine if the condemnation has proceeded on the laws of nations, or on such treaties between particular nations as have been engrafted upon them, as well as to give the insured an opportunity to prove the neutrality of the property, which was formerly denied to the insured.
It were to be wished that the reporter in this case had been a little more copious. It appears to me that the short view which he has given of it, and the grounds on which the decision went, is too limited to authorise us in saying that it ought to control all former decisions on the same subject. I cannot easily be brought to believe, that the English courts have now for the first time opened their eyes upon the correctness of this doctrine, and are themselves beginning to correct the error. Nor could I easily be brought to believe that there is more honesty, or more learning on the English bench at this tir than what has existed there since the *406 Lord Holt came on it. We have no reason to be-lleve, that the British courts have at any time been, more under the influence of, or had stronger inducements to corruption, than at present. Yet, we are called upon to believe this to be the only instance of purity to be found in the system of English jurisprudence, upon this important legal question : and which is to weigh down all the solemn decisions of Holt, Mansfield, and other eminent judges for more than a century back.
In addition to this authority, the plaintiff’s counsel offers the opinion of Judge Cooper, one of the late judges of the state of Pennsylvania, given in the case of the assignees of Brown vs. The Insurance Company of Pennsylvania. This opinion was much relied on to elucidate this question. Yet, notwithstanding its celebrity, and notwithstanding it may be correct in many of its positions, it cannot be received as authority. For it is to be recollected, that judge Cooper stood alone in this opinion, and that there were five other judges, to whose opinions, much' respect ho doubt is due. They all differed from the opinion held by judge Cooper. Then, so far as opinion goes, there were five to one against him. Therefore, by a majority of five to one, this important question is settled in the large and commercial city of Philadelphia, and state of Pennsylvania, that the sentence of a foreign court of admiralty directly upon the point of neutrality is conclusive, in an action between the insured and underwriter. It appears to me, that the opinion of *407 judge Cooper is too critical and censorious, and not sufficiently dispassionate for a fair investigation. He mentions the cases of Pollard vs. Bell, and Bird vs. Appleton, to prove that the English judges have shifted their ground and varied their decisions. But it will be found, upon looking into these cases, that they afford no such evidence of inconsistency. The The case of Pollard vs. Bell, was brought before the Court of King’s Bench, upon a case stated by the parties, in which the grounds were specifically set forth, upon which, the French courts of admiralty had founded their decree : and which was the violation of a French ordinance of 1778. The Court of King’s Bench did not arrive at this ground by Jetting in parol evidence, but it was contained in the sentence itself, from which, it was manifest that the condemnation was not founded on a breach of the laws of nations, or on any particular treaty engrafted on them. In the case óf Bird vs. Appleton, the Court of King’s Bench had the case brought before them on a special verdict. Special verdicts are, for the most part, agreed on by the parties litigant, or found by the jury. This special verdict furnished the court with evidence, that the condemnation was founded on a violation of the decree of the executive directory, and not on a violation of the laws of nations ; and the court declares expressly, that it was on this ground, alone, that the insured was let in to contest the sentence of condemnation of the court of admiralty. The judges also expressly say, if these sentences had not furnished the evidence that they *408 were founded on a breach of private ordinances, they would have been bound to respect them.
This appears to have been the principle constantly adhered to by the English courts, and not a novel one adopted to suit the occasion. The principle is also recognised by the Supreme court of the United States. In the case of Rose vs. Himely, Chief Justice Marshall, in delivering his opinion, said, “ if the court of St. Domingo had jurisdiction “ of the case, its sentence was conclusive; if it had e< no jurisdiction, the proceedings were coram non íc judice, and must be disregarded.” His opinion was concurred in by the other judges. 4 Cranch, 276. ,
When this case first came on to be argued, I conceived the question had been s.ettled in this court in the case of Walton & Pagan vs. Angus Bethune, at the January term 1811. That was an action on a policy of insurance to recover from defendant five hundred dollars, the amount of the sum by him underwritten. This insurance was made on goods, wares and merchandise, belonging to Walton and Pagan, citizens resident in Charleston, on board the brig —-- from port Republic to Norfolk in Virginia. On the trial of this cause, before the Circuit Courrt, it was in evidence that the brig on the 1st of February, 1804, with her cargo on board sailed from port Republic for her port of destination in Virginia. On her Voyage she was captured by a French privateer, and soon afterwards recap *409 tured by a British irian of war, and carried to Kings-ion in Jamaica, there libelled, and a restitution of the brig and cargo was decreed, except 20 hogsheads of coffee; respecting which, there was an in-terloeutory decree of condemnation, unless further proof of its neutral character should be adduced within a time then limitedi This proof was not furnished, and for want thereof, the court of admiralty by its definitive decree, condemned the coffee as belonging to enemies of Great Britain or otherwise. The defendant contended that the condemnation falsified the warranty of neutrality, and was conclusive. But the presiding judge thought otherwise, and permitted the plaintiffs to go into evidence to establish the neutrality of the coffee, which was done to the satisfaction of the jury, and they found accordingly for the plaintiffs.
That case, and the one before us, are extremely alike in all their material circumstances. But it is said the sentences conclude differently. In that case the conclusion is “ as belonging to enemies of Great-Britain or otherwise.” In this case, (i as good and lawful prize to the captors.” And this constitutes such a difference as will authorize the court to open the case, and let the plaintiff into proof of the neutrality of the property, in the action between him and the underwriters.
I know that the decision, and the unanimous decision, of the court in Walton and Pagan vs. Bethune, in which, they granted a new trial, proceeded *410 expressly on the ground of the conclusiveness of the sentence of a foreign court of competent jurisdiction. The same authorities, both English and American, which are now relied upon, were brought before the . , . . , . court in that case; with the exception of the case m Is# Campbell; and the policy of the rule was not questioned by the court. The English authorities equally support both conclusions. In the case of Salancu vs. Woodmass, the ship Thetis, warranted a Tuscan ship, was captured by a Spanish vessel, and condemned as ee good and lawful prize.” Lord Mansfield, who delivered the unanimous opinion of the Court of King’s Bench, said, u it must be pre-<e sumed from the condemnation, as no other cause “ appears, that it proceeded on the ground of the (( property belonging to an enemy.” Par. 472. Mar. 291. The English courts make this distinction, that Ci good and lawful prize,” if the ground on which the decree is founded be given, and that ground a breach of private ordinance, or any other not warranted by the laws of nations, is not conclusive. But if it he a general sentence of condemnation, without assigning any reason, the courts will consider that it proceeded on the ground of the ship’s being the property of an enemy. Le Blanc, J. in Pollard vs. Bell, 8 D. & E. 446. 4.
It is said that England is the only nation that holds this respect for the conclusiveness of the sentence of a foreign court of admiralty, and that we ought not to he bound by their decisions, but should adopt a course for ourselves. But why are we to burst. *411 the bands asunder now ? are we not as much bound by ^ English decisions of this desription as of any other ? do not the same reasons and causes lead thereto, which induce us to give them so much weight in all our other legal decisions ? are we not every day laying hold of the English decisions, ancient as well as modern, and adopting them as our own? or are there any books of Reports in higher esteem, or in more frequent use in our courts, than the English Reports, compiled from decisions made both before and since the American revolution. Our legal system is engraf-ted on them, both by authority and by long and familiar usage.
We were told, and it was pressed with no little zeal in the argument, on the part of the plaintiff, that the British government had lost sight of the laws of nations, and that captures and condemnations are now made under orders in council, paper blockades, &c. that this court ought to set their faces against it, &c. and that their judges are corrupt, &c. I am willing to allow, as I verily believe it to be a fact, that the British government regards the laws of nations no further than comports with their own convenience; and that the courts of admiralty, to speak in the language of Lord Kenyon, will often be found to proceed upon Algerine, and worse than Algerine principles. But I hold it to be a position not to be controverted, that the evil can never be corrected, nor even diminished, by the aid of our common law courts. They may give a new complexion to the decisions on policies of Insurance; *412 they never can cheek the rapacity of the British cruisers, or change the decisions in their courts of admiralty. If, by opposing their sentences, you could bring the correction home to the captors, or to the judges of the courts of admiralty, you might hope to redress the grievance. But what does Lieut. Foley, or the judge of the vice-admiralty court at Nassau, care, whether this court will Jet the plaintiff into proof of the neutrality of the goods or pot. Lieut. Foley has got his share of fhe plunder, and the judge of the vice-admiralty court, (to use the language of judge Cooper,) has got his fifteen pounds, and that is all they tare for. David Bailey and the insurance company may try the case forty times : and Lieut. Foley and the vice-admiralty judge will know nothing about it. Great Britain has constantly refused to listen to the peaceful remonstrances of your ministers, when they have sought a redress of this grievance; can it then be expected that the feeble energies of a court of common law can oppose the smallest barrier to the unprincipled ravagers upon neutral rights ?
I can foresee one evil, but I can foresee no good, that may result from a decision against the' conclusiveness of the sentence of a foreign court of admiralty. It will give a little more scope to speeula-tipn. If you let in the insured to prove the neutrality of his goods after condemnation, he need give himself no trouble to do so before the court of admiralty; that burden will be imposed on the underwriter, It seems to be verified in the case *413 before us. The schooner Lucy was captured on the 24th July, 1806. On the 11th of August, plaintiff offered to abandon to the underwi’iter’s which they refused. On the 24th of August, the cause was suspended, for more than two months, to give the owners an opportunity to interpose further proof the neutrality of the goods. When the further proofs were offered, they were insufficient, and the property was condemned. Then the plaintiff turns round and says to the underwriters, if I could not make proof of the neutrality of my goods in the court of admiralty, I can do so in the Common Pleas. And thus it becomes a mere matter of speculation.
It is argued by plaintiff’s counsel, that the necessary papers to establish the neutrality of the goods were taken away by Lieut. Foley. Therefore, they could not be had at the trial. But we find that Captain Hudson, of the- Lucy, has been examined upon interrogatories and he says not a word about them. The captain was the agent of the plaintiff. He gave testimony for them, and he certainaly knew the papers that were necessary to establish the neutrality of the vessel as well as her cargo. They ought to have been produced or accounted for. It is made a distinct ground by defendants against the new trial; that the vessel was not sufficiently documented nor the property insured: And if the papers were not produced, or accounted for, it is evidence of that defect. It is indispensably necessary to have the sea-letter, which specifies the nature and quality of the cargo, the place from whence it comes, *414 and its destination. Mar. 317. And it is decided by the whole court in the state of New-York, “that a warranty of neutrality, in a policy of insurance, imports, not only, that the property is neutral, but that it shall be accompanied on the voyage with all the accustomed documents to insure it respect as such, within the laws of nations.’* 1 JV\ Y. Term Rep. 564. The plaintiff in this action gave no such evidence of necessary papers on the trial in the circuit court. And this would seem to be a sufficient ground against the new trial, independent of any other.
I would further observe, that notwithstanding the alledged corruption of the British courts of admiralty, it is strongly to be inferred from the circumstances attending this trial, that the condemnation Was for the want of proper documents of neutrality. The schooner Lucy, and the fifty negroes in the second policy, were acquitted without any difficulty and with very little delay: but the eleven negroes insured on a different policy, belonging to a different owner, and destined to a different port, were condemned. And this after a long delay in favour of the claimant’s further proof, if the court intended to act corruptly, why let go the schooner Lucy, and why let go the fifty negroes, and only retain the eleven? why not make a bold stroke and condemn the whole? the papers would have been as easily concealed or destroyed for the whole as for a part; and the inducement must have been infinitely stronger.
*415 It is not for the sake of comity towards other na* J . tions, that I would maintain the conclusiveness of a foreign sentence. If that were the only ground, I would yield my opinion, because, I think, that . , . mere respect to another court, or another nation, ought not to interfere with the fair administration of justice between individuals. But I think it has for its basis other objects of infinitely greater importance, the giving uniformity, permanency and universality, to a principle of law, without which, private property is insecure, and private rights uncertain. Moreover it puts a period to litigation; an object much sanctioned by our legal principles. If it were otherwise, the courts of our country Would be constantly unravaelling the decisions of another. It is an established rule of the English law, that a fact which has been once directly decided, shall ndt again be disputed between the same parties. Peake, 34. And a man who, on being sued, suffers judgment by default, will not afterwards, be permitted to recover back the money, though he can shew by the clearest evidence, that he has paid it before. Peake 35 — 7. 269. These rules of law have been scrupulously adhered to by our own courts; and even against the evident justice of the case. Not for the sake of shutting their eyes upon the rights of the party, and looking at the respect due to another court, but solely to put an end to litigation, otherwise it must be perpetual. The same fact has been decided in another court, the court of admiralty ; and it is literally trying the same fact over again, to hear it in this court. And it is a doctrine, *416 which will not be considered as applicable, to say, one of the parties to the suit abroad, is not a party to the suit here : one of the parties to the suit here, was not a party before the court abroad.” Cooper’s opinion, 70. This argument might be well used by defendants who were not a party to the admiralty suit; but it must come with an ill grace from the plaintiff who has been a party to the suit abroad, and now a party to the suit at home, where, he wishes to ti*y his rights over again, which he cannot do, without violating that principle of law so sacred in. our own courts, as well as the English that a fact which has once been decided directly, shall not again be disputed between, &c.
It is urged, that the British doctrine, if pursued here, would prove very ruinous to the mercantile interest. I deny the position. To fair and hon-ourable enterprise it cannot. Where it is otherwise it is not the object of law to give protection. A merchant may insure against any event in the course of his lawful enterprise. Insurance is a matter depending on contract between the parties. Let the merchant then insure against unjust condemnation — this would not be unlawful. Modify his insurance so as to embrace every risk. This would be sanctioned by our courts of justice. The merchant, it may be said, cannot do this; it would enhance the premium too much. But it is not the merchant alone who is to be protected in his rights. The underwriters are equally entitled. The honest and enterprising merchant is a useful member of *417 áiiy community. But insurance gives life and seeu-rity to commercial enterprise, without which, it would often dwindle into nothing. In the business of insurance, the insured cannot be imposed upon. It is not m the power ot the insurer to do any act which can affect the property insured, either in promoting or impeding its success to its port of destination. The insurer stands perfectly passive. He may be Useful, but cannot be dangerous or corrupt. Fraud and collusion, from the nature of his employment are placed beyond his grasp. On every insurance he may reap a small profit, or sustain a heavy loss. On the other hand, it is in the power of the merchant to change the destiuy of the property insured, by smuggling, by false papers, counterfeit flags, British licence, violating embargo laws, &c. without mentioning custom-house oaths, which are so little respected. If these adventures succeed, the profits go to the insured, if they are detected, it is to be devolved on the insurer, if possible. If there is a condemnation, the sentence must conclude (( as enemies’ property or we are told, that the sentence must be opened, and a new hearing had in the court of Common Pleas, and a second chance given to offer proofs of the neutrality, &c. or it will prove ruinous to this class of your citizens. The laws are not to be strained to suit any class or description of men. If they were, I see no ground to bestow it on the merchant to the injury of the underwriter. I am against the new trial.
*418 Brevard, J.
I shall first consider, and give tny opinion in the case respecting the eleven negroes. The verdict in that case was for the defendants, decree of the British vice-admiralty court at Nassau, which was given in evidence, was in these words, u The judge having heard the further proofs read, and advocates and proctors on both sides thereon, pronounced the same to be insufficient; and decreed the said property to be condemned as good and lawful prize to the captors/’ The presiding judge, at the trial in the district court, in-'1 structed the jury to consider this decree as conclusive to falsify the warranty of neutrality, and the jury found accordingly, I am of opinion this instruction was erroneous, and that the plaintiff is entitled to a new trial.
In the case of Walton vs. Pagan, which was determined in this court, in January, 1811, the terms of the definitive sentence of condemnation, though in most respects similar to that now under review, was in one circumstance materially different. In that case, the coffee insured was condemned “ as belonging to the enemies of Great Britain or otherwise.” In the opinion of the court, as it was expressed on that occasion, it was manifest on the face .of the decree, that the condemnation was on the ground of enemies’ property, and on no other ground, and, therefore, it was deemed conclusive to negative the warranty. And it seemed to be admitted by the court in that case, that if the sentence had been general, or had been expressed in ambig- *419 sous terms, so as to leave it uncertain, whether the . • condemnation proceeded on the ground of enemies’ property, or some other ground, it would not have been considered conclusive. The opinion of the court, as delivered, was, that the terms in which a foreign judgment is expressed, in order to have the effect contended for, must be so positive and explicit, as to negative by necessary construction, the warranty of neutrality.
If, in the present case, the decree was thus positive and explicit; or if the condemnation had been “ because the negroes were not neutral property,” as in the case of Fernandes vs. Dacosta, (Marsh. 290.) I should not be inclined to disturb the verdict. But, I am averse to extending the effect of foreign judgment, and especially admiralty decisions, further than they have been already permitted to go, in conformity to the doctrine of English courts. Lord Mansfield, in the case of Saloucci vs. Woodmass, (Park, 361.) lays it down, that a condemnation, “ as good and lawful prize,” without stating any special ground, is conclusive that the warranty of the property as neutral was untrue. But if it can be collected from the sentence, that the condemnation was for some other cause, as for refusing to be searched, or making resistance, it ought not to be' deemed conclusive. (Saloucci vs. Johnson, 1 Marsh. 292.) In the case of Calvert vs. Bovil, (7 Term Rep. 523.) the sentence declared the brig in question to (( be a good prize for the benefit of the captors,” and this was held not tp *420 be conclusive to folsify the warranty. But it seems J J other reasons were assigned for the sentence., .than that of the vessel’s being enemies’ property. The court, however, appears to have founded its decision on the general ground, <( that it could not he collected from the sentence itself, on what ground the foreign court decided.” Upon this plain, solid foundation I rest my opinion in the present case. A foreign judgment is received in our courts, as conclusive evidence on any subject, on which it has been pronounced, as to those points it professes to decide, if within its jurisdiction; but it is only to be considered so far conclusive as it is positive and clear in its decision. I cannot bring my mind to consent to the doctrine of Lord Mansfield, (i that if the condemnation be general as good and lawful prize, and no reasons are assigned, nor any special ground stated, it must necessarily be inferred, that the condemnation proceeded on the ground of enemies’ property.” I adopt the opinion said to be delivered by Lord Ellenborough, in the case of Fisher v Ogle, (1 Campb. 418,) in which case, the condemnation was as good and valid prize,” without stating any specific ground. “ We shew,” (says his Lordship) i( sufficient respect, if we attach credit in our courts to what foreign courts distinctly say. The sentence of a foreign court is conclusive Íiroof of what it specifically affirms. The adjudicate part only is to be regarded, and so far only as it positively and specifically affirms.” In the case under consideration, the conclusion insisted, on, can Only be established by way of inference, Whether *421 this inference may be fairly deduced from the generality of the decree, or from other parts of it, than that which has been brought into the view of this court, I am not curious to know. I am satisfied that the general rule, as to the conclusiveness of foreign judgments, will not justify the verdict; because it is not positively and specifically affirmed in the decree in question, that the negroes were condemned as enemies’ property.
I now proceed to give my opinion in the case of the schooner. In this case also, the verdict was, for the defendants. The Judge who presided at the trial, in charging the jury in this case, and in the ease of the fifty-two negroes, delivered himself to this effect. ii The eleven negroes taken on board (i the schooner, were condemned as good and lawful (i prize; the presumption is, that the condemnation was on the ground of enemies’ property, because ii no contrary reasons are assigned in the sentence. (i This presumption not being repelled, is equal to “ positive proof, and conclusive to falsify the war- “ ranty of neutrality. Then, as the negroes were justly forfeited as enemies’ property, and as they {< were found on board the schooner, the schooner i( was thereby exposed to seizure and detention; (< therefore the underwriters.are not liable.” The Judge however, doubted whether this reasoning ought to extend so far as to affect persons, interested in the fifty-two negroes, who were not interested also in the eleven negroes condemned. Upon the whole, however, he inclined to think the insured *422 were all liable to sustain the loss pro rata. The jury most probably were governed by .this advice and disection, in giving their verdict , for the defendants *n ^e case °f the schooner? although they were induced to find for the plaintiff? in the other ease concerning the fifty-two negroes.
As the logic? by which the jury were" convinced, is not quite satisfactory to my mind? I must take the liberty of dissenting from it. The reasoning of the court may be reduced to a syllogism something like this. The schooner was not condemned as good prize, but was considered in the light of neutral property? and as such was acquitted and ordered to be restored to the owners. But eleven negroes? part of the schooner’s cargo, were condemned as enemies’ property, whereby the warranty of those ne-groes was falsified: therefore the warranty of the schooner was likewise falsified. But this conclusion seems to me to be a non sequitur. This case is not like those where the goods of a neutral are so mixed with those of a belligerent, that they cannot be distinguished one from the other. The schooner was warranted neutral property? and was acquitted. The conclusion must be? that she was not proved to be other than neutral. The indemnity claimed is for damages sustained by the perils of the sea. It seems to be no answer to this claim to say? that she was unjustly captured and detained. Unlawful capture and detention is one of the perils insured against. It. seems to be no good objection to the claim? to pretend that part of the cargo on board was enemies’ *423 property, because that property alone is liable to forfeiture, and not other property which is neutral. I cannot reconcile to myself the propriety of holding, that, because a man has warranted a negro to be neutral property, and the negro is condemned as enemies’ property, he shall not be indemnified for a loss, by the capture and detention of a ship, (and by the perils of the sea,) if there is no other cause for disputing the claim to indemnity, than merely because, the negro happened to be found on board the ship. The doctrine insisted on, would push the comity of nations off the stage entirely ; for it would not give, credit to foreign judgments, even when they happened to be in fayour of neutral commerce : or else it would pay such an absurd deference to them, as to give them credit for what they do not pretend to say, and even contrary to what they say.
I now come to the case of the fifty two negroes, in which case the verdict was for the plaintiff. With this verdict, the plaintiff is not satisfied, but as it is by ño means clear to me that the verdict is not according to the justice of the case, I am opposed to granting a new trial. The brief states that the verdict is for ¡8856,60, being the amount expended by him in cloathing and provisions for the negroes while at Nassau, excluding all compensation for the hire of thé brig Euphemia.” The contract of insurance is a contract of indemnity for all losses within the policy. The inquiry must be, was this loss within the policy, and what was the extent thereof ? Damage by capture and detention, and damage by the perils of the sea, *424 were insured against. The negroes were claimed as enemies’ property and detained for trial, and in the mean time some of them perished. The claim was dismissed, and the property was restored to the assured. The detention was therefore illegal, and the assured are entitled for all losses thereby sustained. Every loss must be imputed to its immediate, and not to any remote cause. It is stated in the brief, (and I quote that, because it is always presumable the appellant will give his case the best complexion,) “ that the vessel and cargo received great injury whilst lying in the harbour of Nassau, by a violent storm, and many of the negroes died.” Now, nothing certain as to the extent of the loss can be collected from this statement. How many of the negroes died? What were the approximate causes of their death ? Did they die in consequence of any cause immediately arising from any of the dangers insured against? , Was their death imputable to capture and detention, or sea-damage ? Did any of them perish by natural mortality or by other causes, not within the policy, and how many ? I concede, that the loss was at one time total, by the capture, and that the plaintiff had a right to abandon, as he did. But the defendants did not accede to the offer to abandon, and did not pay the loss; and the negroes were afterwards released. In the final event, the loss was not total, but partial; and the plaintiff is entitled to no more than an indemnity for the loss actually sustained. I am not convinced that the loss is more than the jury have allowed by their verdict. I. doubt if it is even so much. It is an invariable *425 Mle, that the loss must be appreciated according to the prime cost, adding all duties and expenses, and also, the premium of insurance. Marsh. 535. How much was the property diminished in value by any of the perils insured against, and what was the value of that loss in proportion to the whole value ? These are questions which cannot be answered with any certainty froin the evidence reported in the case.
As to the hire of the brig Euphemia, I lay that out of the case, as irrelevant matter. Suppose the freight had been insured, is it not evident that the plaintiff’s right to indemnity would have been against the insurers on the freight, and not against the insurers on the ship or cargo ? But the plaintiff was his own insurer as to the freight, and must therefore, bear the loss, which happened on that score. As between the insured and the underwriters upon the cargo, it is a contract of indemnity, and the latter has nothing to do with the freight. The owner of the ship has a lien 'on the goods for his freight. Marsh. 628. It was the duty of the freighter to carry the negroes safely to the port of destination, and feed (and perhaps clothe) them on the passage. The allowance for provisions for the negroes, was in my opinion illegal; but as the defendants do not. complain thereof, I am for leaving the verdict unmolested.